J-S24019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.R.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.L.L., MOTHER | : : : : : : : | |
| | : | No. 278 WDA 2025 |

Appeal from the Decree Entered February 4, 2025
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s): AD-12 for 2024

BEFORE: NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED: September 4, 2025**

T.L.L. ("Mother") appeals from the decree involuntarily terminating her parental rights to B.R.S. ("Child"). Mother argues the court disregarded the obstacles that prevented her from performing parental duties, her attempts to overcome those obstacles, and Child's best interests. We affirm.

Mother and Child's father, B.L.S. ("Father"), were married in 2017. They divorced in August 2019, when Child was two years old. Father has since exercised primary custody of Child. Mother initially exercised physical custody of Child on alternating weekends; Mother's custody was later reduced to weekly visitation with Child at Father's home, supervised by Father's partner, B.J.S. Mother's last contact with Child was in late 2020, when Child was three years old. Shortly thereafter, in January 2021, Mother was hospitalized with COVID-19. She was transferred to a rehabilitation facility, where she remained

until March 2024.[1] In the interim, in 2022, Father married B.J.S. ("Stepmother").

In August 2024, Father filed a petition for the involuntary termination of Mother's parental rights. The court appointed a guardian *ad litem* for Child[2] and counsel for Mother. The court held a hearing on December 20, 2024, where Mother, Father, and Stepmother testified. Child was seven years old at the time.

Following the hearing, the court found there was clear and convincing evidence that Mother, "by conduct continuing for a period of at least six months immediately preceding the filing of the Petition[,] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Trial Ct. Op. at 4 (quoting 23 Pa.C.S.A. § 2511(a)(1)). The court gave the following analysis:

> Mother alleged that Father and [Stepmother] prevented her from maintaining contact with the child despite [Mother's] best efforts. However, the evidence does not support Mother's position. While in the facility, Mother had access to a telephone where she could make and receive telephone calls. Mother also had internet

---

[1] The reasons for Mother's prolonged treatment are disputed. While Stepmother testified the facility informed her that Mother "was being treated for various psychological and physical issues related to COVID-19," Mother maintained "that her treatment was not related to her mental health and was solely for physical issues." Trial Court Opinion, filed 2/4/25, at 2.

[2] The guardian *ad litem* told the court she was unable to ascertain Child's legal interest due to his autism. The court determined there was no conflict between Child's best interest and legal interest. No party objected to this determination or requested the appointment of additional counsel for Child. **See** Trial Ct. Op. at 2.

access and use of a tablet. Additionally, Mother had the ability to use the mail. While in the facility, [Stepmother] was on Mother's call list, and Father was added after his identity was verified by staff. [Stepmother] credibly testified that she spoke to Mother several times during her hospitalization. Early on in her rehab stay, Mother called [Stepmother] and they discussed Mother missing a court appearance in the custody case, and Mother called [Stepmother] again to discuss access to a bank account. [Stepmother] further testified to another call about the status of Mother's health. [Stepmother] testified that these initial few calls were essentially to discuss Mother's condition and that Mother did not ask about the child. [Stepmother] testified that she called Mother another time to advise her that the child was having anesthesia for dental work. [Stepmother] continuously had the same cell phone number and never blocked Mother from calling. Mother testified that she tried calling [Stepmother] 5-6 times after her discharge but each time there was a recording that it was disconnected. [Stepmother] credibly testified that she never received any of those calls and her cell phone number has consistently remained the same at all times relevant hereto.

Mother testified that she tried to contact Father and [Stepmother] via Facebook on multiple occasions while at the rehab facility. Mother testified that she sent a Facebook Messenger message to [Stepmother] on November 27, 2022. The exhibit indicated that "this person in unavailable on Messenger," which is consistent with [Stepmother]'s testimony that she has had Mother blocked on Facebook since 2019. Father credibly testified that he maintains multiple Facebook accounts. Mother entered screenshots showing multiple attempts at contact with Father via Facebook Messenger from April 24, 2023, until December 11, 2024. There was no conclusive evidence that Father received any of Mother's attempts at contact via Facebook Messenger. Generally, when a message is read, a blue check mark appears next to the message. However, none of the messages show the blue check mark evidencing receipt. The [c]ourt questions why Mother would continue sending repeated messages after receiving no response for such a long period of time, rather than seeking an alternate method of contact. Mother testified that Father used this Facebook account because he posted a yard sale event on August 12, 2024.

Father and [Stepmother] continued to live at the same address where Mother previously exercised her partial custody until they moved in October 2022. Upon moving to the new

address, [Stepmother] provided their new address to the social worker at the facility and thereafter confirmed that the facility had the information. The [c]ourt notes that during her stay, Mother took multiple thirty-day leaves of absence from the facility. Mother would stay with her father and the evidence showed that Mother traveled to Ohio and Florida and music concerts. Mother claimed that she did not receive Father and [Stepmother]'s new address until her discharge on March 28, 2024. However, Mother had easy access to the internet where she could have searched and obtained Father's new address while still in the facility. Additionally, Mother could have telephoned [Stepmother] during this time, but did not do so. The [c]ourt notes that in her testimony, Mother acknowledged that she never mailed or attempted to mail anything to the child because she "figured Father would throw it out." Mother never even attempted to mail anything to the child.

Upon discharge on March 28, 2024, Mother moved in with her father in Glassport, Pennsylvania, where she continues to reside. Upon moving in with her father, Mother took little to no affirmative actions to re-establish contact with the child. By her own testimony, Mother had Father's new address upon being discharged, but yet took no steps to establish contact, mail the child anything, or file a custody petition. Mother testified that she did not go to Father's house because the state police were summoned during the last visit she had with the child in 2020. Mother did not pursue exercising the custody rights already granted to her in the Custody Consent Order. Furthermore, Mother did not pursue her custody rights by filing a Petition to Modify the custody order. Mother testified that she called the courthouse to inquire about filing a petition but was told she should contact an attorney. Mother then testified that she contacted a few attorneys but they all charged too much. Mother testified that she "did not know she could file a petition herself without an attorney." The [c]ourt finds this testimony not credible as Mother has filed MANY *pro-se* petitions in her custody case from 2018 until 2021, most of which this jurist presided over.

Father and [Stepmother] testified that during her stay at the rehab facility, Mother never called for the child, that she did not mail any cards, gifts or letters for the entire three years. In her testimony, Mother acknowledged having the ability to send mail, testifying that she mailed her father and aunt multiple cards while in the facility. Additionally, after her discharge on March 28, 2024, Mother did not reach out to inquire about the child, did not

mail the child any cards, gifts or letters, did not file any petition in the custody case, and essentially took no steps to exercise the supervised custody rights that had been previously afforded to her. Furthermore, Mother testified that she did not know the child left the Everett School District and now attends Soaring Heights School. However, Mother acknowledged that she never once called Everett (where she thought [Child] was still attending) to check on his educational progress. Mother also testified that her father tried calling [Father] but "couldn't get through." However, the evidence was vague as to this assertion. There was no evidence of when the alleged call took place or how many attempts were made.

Mother also testified that she spoke to the child via Facebook Video in December 2023. Father and [Stepmother] denied that this ever occurred. The [c]ourt finds that Mother's testimony was not credible in this regard. As set forth above, [Stepmother] credibly testified that she had Mother blocked on her Facebook account since 2019, and as such, the video chat would not have been possible. Additionally, if the video call had occurred, Mother would have easily been able to screenshot the fact that it occurred, just like she did with all of her other exhibits. However, even if the December 2023 Facebook video call did take place, it would not be sufficient to change the [c]ourt's findings relative to the lack of barriers to Mother's performance of parental duties.

It would appear that following her discharge on March 28, 2024, the only steps Mother took was to continue sending Facebook Messenger messages to Father, which he seemingly never opened and possibly made several telephone calls to attorneys.

*Id.* at 6-10 (footnote omitted).

The court also found there was clear and convincing evidence that termination of Mother's parental rights would best serve Child's developmental, physical and emotional needs and welfare. *See id.* at 11 (citing 23 Pa.C.S.A. § 2511(b)), 13. It gave the following reasons:

In the instant matter, Mother has not had in-person contact with the child since late 2020 when he was three years old. Since

- 5 -

that time, he has been consistently in the care and custody of his Father and [Stepmother]. Father and [Stepmother] have been together since 2019 and married since 2022. The child currently has the benefit of a stable intact family. The Petition for Involuntary Termination of Parental Rights was filed so that [Stepmother] can adopt the child.

The child has been diagnosed with autism. Father and [Stepmother] appear to be very proactive and responsive to his many special needs. For the past two years, the child has attended a special school for autistic children.

Mother testified that when she previously exercised her periods of supervised partial custody, that they had a good relationship. Mother testified that she had a video call with the child December 2023, wherein the child called her "mama." However, as set forth above, there was not sufficient credible evidence provided to this [c]ourt to make a finding that the call took place.

There was no evidence that there exists a discernable bond between Mother and child. On the other hand, there is evidence that the child has been in a loving intact family unit, all of his needs are being met[,] and he is well cared for. The attorney for the child, Carol Ann Rose, Esquire, has experience with autistic children. As a result of his diagnosis, Attorney Rose met the child in his home, rather than in an unfamiliar office setting. The meeting lasted approximately two (2) hours. Attorney Rose reported that it was not possible to have a typical conversation with the child. However, she spent time in the same room as the child, Father and [Stepmother]. While the child essentially ignored Attorney Rose, she observed the child refer to Father as "daddy" and [Stepmother] as "mom and mommy." When Attorney Rose stated [Mother's name] the child displayed no reaction whatsoever. However, the [c]ourt acknowledges that the child likely never referred to [Mother by her name]. However, of relevance to the [c]ourt is that the child views and refers to [Stepmother] as "mom or mommy."

*Id.* at 11-12. The court terminated Mother's parental rights.

In this ensuing appeal, Mother raises the following issues:

I. The Lower Court erred or abused its discretion when it held that [Father and Stepmother] met their burden of proof pursuant to 23

Pa.C.S.A. [§] 2511(a)(1) and (b) when the Court terminated [Mother's] parental rights.

II. The Lower Court erred or abused its discretion when it found that Father and Stepmother did not prevent Mother from maintaining contact with the minor child.

III. The Lower Court erred or abused its discretion in its totality of the circumstances inquiry by not finding that the Father and Stepmother placed barriers upon Mother that prevented Mother from maintaining the parent-child relationship.

IV. The Lower Court erred or abused its discretion in its totality of the circumstances inquiry by not finding that Mother faced barriers that prevented her from maintaining the parent-child relationship due to Mother's hospitalization with COVID-19 complications.

V. The Lower Court erred or abused its discretion in its totality of the circumstances inquiry by not finding that Mother acted with reasonable firmness in an effort to overcome the barriers placed by Father and Stepmother, and Mother's hospitalization with COVID-19 complications.

VI. The Lower Court erred or abused its discretion when it found that Mother did not have a discernable bond with the minor child.

VII. The Lower Court erred or abused its discretion when it held that terminating Mother's parental rights was in the child's best interest pursuant to 23 Pa. C.S.A. [§] 2511(b).

Mother's Br. at 3-4 (trial court answers omitted). Father and Child's guardian

*ad litem* have filed briefs supporting termination.

The following standard applies to the involuntary termination of parental

rights:

A party seeking termination of parental rights bears the burden of establishing grounds for termination "by clear and convincing evidence." ***In re Z.S.W.***, 946 A.2d 726, 728 (Pa.Super. 2008). Clear and convincing evidence is evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***Id.*** at 728-729 (internal quotation marks and citation omitted). We accept the findings of

- 7 -

fact and credibility determinations of the trial court if the record supports them. **See In re C.M.C.**, 140 A.3d 699, 704 (Pa.Super. 2016). If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion. **Id.**

**In re Adoption of K.C.**, 199 A.3d 470, 473 (Pa.Super. 2018).

"Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis." **In re T.L.H.**, 336 A.3d 1069, 1079 (Pa.Super. 2025) (footnote omitted). The court must first focus on the conduct of the parent and determine if grounds for termination exist under any subsection of Section 2511(a). **Id.** If so, the court must turn to Section 2511(b), and determine if termination best serves the child's needs and welfare. **Id.**

Relevant here, Section 2511(a)(1) is applicable when "the parent's conduct during the six months preceding the filing of the termination petition demonstrate[d] either a settled intent to relinquish parental rights, or a refusal or failure to perform parental duties." **K.C.**, 199 A.3d at 473-74 (citing 23 Pa.C.S.A. § 2511(a)(1)). "Parental duty" in this context "is a positive duty requiring affirmative performance." **In re Adoption of C.M.**, 255 A.3d 343, 364 (Pa. 2021). It "requires that a parent exert [herself] to take and maintain a place of importance in the child's life." **Id.** (citation omitted).

If the court finds the parent has failed to perform parental duties for the relevant six-month period, the court must examine the individual circumstances of the case, including the parent's explanation for the failing and her subsequent efforts to reestablish contact with the child. **Id.** at 365;

*accord In re: Adoption of L.A.K.*, 265 A.3d 580, 593 (Pa. 2021). It is within the trial court's discretion to determine whether the parent has faced any barriers to her performance of parental duties. *L.A.K.*, 265 A.3d at 593; *see also id.* at 599. The critical inquiry under subsection (a)(1) is "whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties." *Id.* at 592-93. A parent may not wait "for a more suitable or convenient time to perform [her] parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* at 588 (citation omitted).

If grounds for termination are established under Section 2511(a)(1), Section 2511(b) then requires the party seeking termination to prove "that termination would best serve the child's needs and welfare[.]" *Int. of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). The court must place the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* This includes "intangibles such as love, comfort, security, and stability"; "whether the [child] is in a pre-adoptive home and whether they have bonded with their [pre-adoptive] parents"; the child's bond with their biological parent; and "whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 1106-07 (citations omitted). The trial court has "discretion to place appropriate weight on each factor present in the record

before making a decision regarding termination that best serves the child's specific needs." *Id*. at 1113.

Mother's first five arguments repeat a single refrain. Mother contends the record reflects "that barriers were placed upon Mother by the Father and Stepmother, whether purposefully or passively, and by Mother's hospitalization," and that she used reasonable firmness in attempting to overcome those barriers. Mother's Br. at 17, 24. Mother asserts she testified that she lost Father's and Stepmother's telephone numbers and was only able to speak with Stepmother when Stepmother initiated a call. *Id.* at 17-18. Mother claims that whenever she attempted to call Stepmother, she would receive an error message because Stepmother had blocked her telephone number. *Id.* at 18. Mother also argues the record reflects she was unable to contact Father or Stepmother via e-mail, and that Father purposefully refused to read the Facebook messages Mother sent him. *Id.* at 19-20. Mother argues she credibly testified she could not visit Child on the occasions when she was permitted to leave the facility, because she was unable to confirm Father's address and was afraid that if she arrived at the residence unannounced, Father and Stepmother would call the police. *Id.* at 21. Mother further argues the court erred in faulting her for failing to send Child any mail or gifts, when she testified that she believed Father would not give them to Child. *Id.* at 21-22.

Mother's arguments are unpersuasive. If they are supported by the record, we may not disturb the trial court's credibility findings or re-weigh the

evidence. ***L.A.K.***, 265 A.3d at 598; ***K.C.***, 199 A.3d at 473. The court found that Mother had access to Stepmother's telephone number and a telephone, and that Stepmother had not blocked her calls. The court also credited Stepmother's testimony that on her calls with Mother, Mother never inquired about Child. The court further found that Mother had access to Father and Stepmother's physical address but never attempted to mail anything there. The court noted Mother failed to call Child's school district or file a petition in the custody matter. These findings are supported by the record. Thus, even assuming Mother's testimony was true, and she was unable to place a call to Stepmother from her own telephone while in the rehabilitation facility, the court was within its discretion to determine that Mother's efforts at attempting to maintain any relationship with Child, both before and after her release from the rehabilitation center, fell short of the "reasonable firmness" required by Section 2511(a)(1).

Mother's last two issues relate to her bond with Child and the court's conclusion that termination of her parental rights is in Child's best interest. Mother argues the court erred in finding she did not have a bond with Child. She asserts she had in-person contact with Child until she was hospitalized in 2021, when Child was three and a half years old. Mother claims that she had a video chat with Child in 2023, wherein Child referred to her as "momma." Mother's Br. at 38. Although Mother recognizes the trial court rejected this testimony, she argues the court erred in holding there was no evidence of a

discernable bond between her and Child. *Id.* She further argues that Child's autism makes it difficult to discern the bond between her and Child. *Id.* at 47.

Mother also asserts that the court erred in concluding termination of her parental rights is in Child's best interest. According to Mother, "[t]he only evidence that Father or Stepmother presented that concerned their ability to provide for the needs and the welfare of the child was that the child was placed in a private school for autistic children." *Id.* at 45. She points out that she was involved with Child's life until her hospitalization and "was the one that met with school staff and enrolled the child in an IU8 program." *Id.* at 46. Mother argues there was no evidence that she "was incapable of providing for the child's development[al], physical, and emotional needs[.]" *Id.* at 47.

In its Section 2511(b) analysis, the court noted that Mother had not had any contact with Child for four years. Child was seven years old at the time of the hearing. Thus, the record supports the court's conclusion that Mother and Child have no discernable bond. In contrast, Child has lived with Father and Stepmother since he was two years old, and Stepmother has fulfilled a maternal role in Child's life since at least the beginning of Mother's hospitalization. The court considered Child's need for stability and Stepmother's intent to adopt him. It was within the court's discretion to weigh these factors and determine that termination of Mother's parental rights and adoption by Stepmother will best serve Child's needs and welfare. *K.T.*, 296 A.3d at 1113.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  9/4/2025